Entered: September 15th, 2017
Signed: September 14th, 2017



THOMAS J. CATLIOTA
U.S. BANKRUPTCY JUDGE

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
at GREENBELT

| | | |
|---|---|---|
| In re: | * | Case No.  15-24433-TJC |
| Lasting Impressions Landscape | * | Chapter   11 |
| Contractors, Inc. | * | |
| Debtor | * | |
| * * * * * * * * | * | |
| Ford Motor Credit Company, LLC | * | |
| Movant | * | |
| vs. | * | |
| Lasting Impressions Landscape | * | |
| Contractors, Inc. | * | |
| Respondent | * | |
| * * * * * * * * * * * * * | | |

## MEMORANDUM OF DECISION

Ford Motor Credit Company, LLC ("Ford") brought seven motions for relief from stay to exercise its rights against trucks that are the subject of a master lease agreement and separate supplement agreements with the debtor, Lasting Impressions Landscape Contractors, Inc. ECF 106, 107, 108, 109, 112. The debtor opposes the motions, contending the transactions were secured financing arrangements and not true leases. After discovery, partial settlement, and trial, five leases remain in dispute. The parties have agreed to bifurcate the dispute and have the court

1

first determine whether the transactions were secured financing arrangements or leases. For the reasons discussed below, the court finds that the agreements constitute secured financing arrangements.

**Findings of Fact**

The debtor is a landscape contracting company providing services in southern Maryland. It filed a voluntary petition for Chapter 11 relief on October 16, 2015.

The debtor leases a number of vehicles used by its employees in their daily tasks. As relevant here, the debtor entered into a master lease agreement (the "Master Lease") with Ford on January 7, 2014. Ford Proof of Claim 28-2, Part 2. Through the Master Lease and several related Supplements to Commercial Master Lease Agreement (the "Supplements"), the debtor leased seven trucks from Ford to be used in the debtor's operations. The Master Lease contains the general terms governing all leases, while the Supplements provide the vehicle information and monetary terms for each leased vehicle. Specifically, the Supplements state the capitalized cost of each vehicle, provide the monthly lease charge, and require monthly installments over a 60-month term. The Supplements state the vehicle's assumed residual value, which in each case is 10% of the capitalized cost ("Assumed Residual").

The following is a summary of the pertinent terms for each vehicle:

| Vehicle | VIN (last four) | Capitalized Cost | Assumed Residual (10%) | Lease Charge |
|---|---|---|---|---|
| 2015 Ford OHT-D | 6649 | $76,388.18 | $7,638.82 | $1,401.10 |
| 2015 Ford F-350 SRW | 1620 | $65,644.14 | $6,564.41 | $1,204.03 |
| 2015 Ford F-350 DRW | 6463 | $70,306.44 | $7,030.64 | $1,269.55 |
| 2015 Ford F-350 DRW | 9190 | $70,306.44 | $7,030.64 | $1,269.55 |
| 2015 Ford F-350 DRW | 5555 | $66,998.51 | $6,699.85 | $1,194.41 |
| 2015 Ford F-350 DRW | 5556 | $66,998.51 | $6,699.85 | $1,194.41 |
| 2015 Ford F-350 SRW | 1619 | $66,280.14 | $6,628.01 | $1,215.70 |

Paragraphs 10 through 12 of the Master Lease contain the provisions for the treatment of the trucks and the amounts that must be paid to Ford upon expiration or early termination of a lease. These paragraphs provide:

> **10. RETURN OF LEASED VEHICLE.** Upon the expiration or termination of the Lease Term of any Leased Vehicle, Lessee will return, at its own expense, such Leased Vehicle to a reasonable location designated by Lessor. Lessee will return all unexpired license plates with each Leased Vehicle. At Lessor's request and on behalf of Lessor, Lessee will store any Leased Vehicle for a period not to exceed thirty (30) days at Lessee's expense, other than for insurance coverage, which will be provided by Lessor. If Lessor has not received title documents for the Leased Vehicle in order to permit sale of such Leased Vehicle or such Leased Vehicle is not returned to Lessor in accordance with this Paragraph 10, then Lessee will pay Lessor the then applicable Early Termination Value and Lessor will transfer all of its rights and title and interest in such Leased Vehicle to Lessee.
>
> **11. EARLY TERMINATION.**
>
> (a) <u>Calculation of Early Termination Value</u>. The Early Termination Value for a Leased Vehicle for any particular period during the Lease Term will be equal to (i) the Capitalized Cost of such Leased Vehicle, plus (ii) any Charges due and payable under the Lease Agreement with respect to the Leased Vehicle, less (iii) that part of the Lease Charges paid by Lessee with respect to the Leased Vehicle, which has been earned by Lessor on an actuarial basis.
>
> (b) <u>Sale by Lessee</u>. Lessee may terminate the lease of any Leased Vehicle prior to the expiration of the Lease Term thereof by giving Lessor at least thirty (30) days prior written notice of its election to terminate such lease. After giving such notice of termination, at Lessor's option, Lessee must attempt to sell such Leased Vehicle, as agent for Lessor, in an arm's length transaction to an unrelated purchaser in accordance with Paragraph 9. Upon such sale, the lease of such Leased Vehicles will terminate and Lessee will promptly notify Lessor and remit to Lessor the proceeds of such sale, any Lease Charges and other Charges due and owing through the date of termination and any additional Charges calculated in accordance with this Paragraph 11(b). If the Net Proceeds of such sale are less than the applicable Early Termination Value for such Leased Vehicle on the date of termination, Lessee will pay to Lessor the deficiency as an additional Charge. If the Net Proceeds of such sale exceed the applicable Early Termination Value for such Leased Vehicle on the date of termination, Lessor will pay or credit the excess to Lessee as a refund of Charges.

3

(c) <u>Sale by Lessor</u>. If Lessee is unable to sell the Leased Vehicle on behalf of Lessor within thirty (30) days of the date of such notice of termination, Lessee will promptly deliver the Leased Vehicle to Lessor as provided in Paragraph 10, and Lessor will attempt to sell such Leased Vehicle in accordance with Paragraph 9. The lease of such Leased Vehicle will terminate upon the earlier to occur of (i) the date of such sale by Lessor, or (ii) the date that is thirty (30) days after the date of delivery of the Leased Vehicle to Lessor. Upon the date of termination, Lessee will pay Lessor an amount equal to any Lease Charges and other Charges then due and owing hereunder to the date of termination, and either (x) the excess, if any, of the applicable Early Termination Value for such Leased Vehicle over the Net Proceeds of any sale, if Lessor was able to sell the Leased Vehicle prior to the termination date, or (y) the applicable Early Termination Value, if Lessor was unable to sell such Leased Vehicle prior to the termination date.

(d) <u>Other Disposition of Leased Vehicle</u>. In lieu of attempting to sell the Leased Vehicle pursuant to Paragraph 11(b) or returning the Leased Vehicle to Lessor pursuant to Paragraph 11(c), Lessee, with the consent of Lessor, may dispose of such Leased Vehicle for its own account, and the lease of such Leased Vehicle will terminate upon Lessee paying to Lessor the applicable Early Termination Value for such Leased Vehicle, plus any Lease Charges and other Charges then due and owing to the date of termination.

**12. EXPIRATION OF LEASE.** Upon the expiration of the Lease Term of a Leased Vehicle, at its option, Lessor may sell such Leased Vehicle in an arm's length transaction within thirty (30) days after expiration of its Lease Term or may appoint Lessee as Lessor's agent to sell such Leased Vehicle on Lessor's behalf in accordance with Paragraph 9. If Lessee, as Lessor's agent, sells the Leased Vehicle, Lessee will remit to Lessor the proceeds from such sale, any Lease Charges and other Charges then due and owing, and any additional Charges determined in accordance with this Paragraph. If the Net Proceeds of such sale are less than the Assumed Residual for such Leased Vehicle, Lessee will pay to Lessor the deficiency as an additional Charge. If the Net Proceeds of such sale exceed the Assumed Residual for such Leased Vehicle, Lessor will pay or credit the excess to Lessee as a refund of Charges.

Master Lease, ¶¶10-12.

At the hearing, the debtor's president, James Flippo Jr., testified that the parties intended to create a security agreement. He stated that the parties designed the agreement as a lease to allow debtor to maintain the requisite 1.2:1 debt-to-income ratio required by its loan covenants.

Structuring the transaction as a lease allowed the company to obtain the vehicles and keep them off the books as long term debt.  He also testified that he acquired the vehicles with the expectation of keeping them for 10 to 15 years.  He understood that as long as he paid 10% at the end of the lease (i.e., the Assumed Residual), the debtor could keep the truck.  The 10% residual value was agreed to by the parties to allow for a quick buyout at the end of the lease.  He further testified that the expectation of both parties was that the debtor would pay the 10% and keep the trucks.

Prior to filing its petition, the debtor defaulted on the leases.  Ford filed seven motions seeking relief from the automatic stay to recover the vehicles.  ECF 106, 107, 108, 109, 110, 111, 112.  The debtor filed answers opposing each motion.  ECF 161, 162, 163, 164, 165, 166, 167.  Two of the motions, ECF 110 and 111, have been resolved by consent agreement.  ECF 418, 419.  The parties agree that the remaining motions raise identical issues.

## Jurisdiction

This court has subject matter jurisdiction pursuant to 28 U.S.C. §§1334(b) and 157(a) and Local Rule 402 of the United States District Court for the District of Maryland.  This is a core proceeding pursuant to 28 U.S.C. §§157(b)(2)(A),(B),(G) & (O).

## Conclusions of Law

During the case, the debtor has been making what it deems to be adequate protection payments to Ford.  Those monthly payments are less than the payments due under the leases.  Ford seeks relief from stay based on 11 U.S.C. §365(d)(5), which requires a Chapter 11 debtor to timely perform all of its obligations under an unexpired lease of personal property first arising from and after 60 days after the petition date.  Ford argues that the debtor's failure to comply with 11 U.S.C. §365(d)(5) is cause for relief from stay under 11 U.S.C. §362(d)(1).  The debtor

5

contends that the transactions are secured financing arrangements and not true leases. It argues the payments it has been making are adequately protect Ford during the case, and that no other grounds exist under 11 U.S.C. §§362(d)(1) or (d)(2) to grant relief from stay.

The parties have asked the court to first resolve the question of whether the transactions are true leases or secured financing arrangements, and the parties will proceed with the motions as appropriate once this determination is made.

I.

Before turning to the central dispute, the court must determine whether the Master Lease and the Supplements are unambiguous on the amount paid to Ford upon expiration or early termination of a lease. "Under Maryland law, the interpretation of a contract, including the determination of whether a contract is ambiguous, is a question of law." *Washington Metro. Area Transit Auth. v. Potomac Inv. Properties, Inc.*, 476 F.3d 231, 234-35 (4th Cir. 2007) (quoting *Gresham v. Lumbermen's Mut. Cas. Co.*, 404 F.3d 253, 260 (4th Cir. 2005)). "In determining whether a writing is ambiguous, Maryland has long adhered to the law of the objective interpretation of contracts." *Calomiris v. Woods*, 727 A.2d 358, 363 (Md. 1999); *State v. Attman/Glazer,* 594 A.2d 138, 144 (Md. 1991); *General Motors Acceptance v. Daniels,* 492 A.2d 1306, 1310 (Md. 1985). Under the objective view, a written contract is ambiguous if, when read by a reasonably prudent person, it is susceptible of more than one meaning. *Sy-Lene of Washington v. Starwood Urban Retail II, LLC.*, 829 A.2d 540, 547 (Md. 2003); *Heat & Power Corp. v. Air Products & Chemicals, Inc.,* 578 A.2d 1202, 1208 (Md. 1990); *Truck Ins. Exch. v. Marks Rentals,* 418 A.2d 1187, 1190 (Md. 1980). The determination of whether language is susceptible of more than one meaning includes a consideration of "the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution." *Pacific*

*Indem. v. Interstate Fire & Cas.,* 488 A.2d 486, 488 (Md. 1985). Therefore, when interpreting a contract the court's task is to:

> determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated. In addition, when the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed. In these circumstances, the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant. Consequently, the clear and unambiguous language of an agreement will not give away [sic] to what the parties thought that the agreement meant or intended it to mean.

*General Motors Acceptance,* 492 A.2d at 1310 (citing *Board of Trustees v. Sherman,* 373 A.2d 626, 629 (1977)).

Paragraph 12 governs the sale of a vehicle upon expiration of a lease. It is unambiguous. Upon expiration of a lease, under certain circumstances, Ford can sell the vehicle or the debtor can sell it, but either way Ford must be paid—in addition to all other amounts due under the lease—the Assumed Residual. If a vehicle is sold for more than the Assumed Residual, Ford is paid the Assumed Residual and the debtor receives the excess amount. If a vehicle is sold for less than the Assumed Residual, the debtor must pay Ford the difference to ensure that Ford is paid the Assumed Residual. The parties agree that the leases operate in this fashion.

The Master Lease is ambiguous, however, on what is paid to Ford if the debtor retains the vehicle at the expiration of the lease or the debtor terminates the lease early. No reasonably prudent person can determine what must be paid to Ford in these circumstances by reference to the language of the Master Lease and the Supplements. As discussed above, Paragraph 12 addresses the sale of the vehicle upon expiration of the lease. But Paragraph 10 addresses the amount that must be paid to Ford if the debtor simply retains the vehicle:

> If Lessor has not received title documents for the Leased Vehicle in order to permit sale of such Leased Vehicle or such Leased Vehicle is not returned to

7

> Lessor in accordance with this Paragraph 10, then Lessee will pay Lessor the then applicable Early Termination Value and Lessor will transfer all of its rights and title and interest in such Leased Vehicle to Lessee.

Master Lease, ¶10. If the debtor retains the vehicle upon expiration, or if the debtor terminates the lease early, Paragraph 10 provides that Ford must receive the "Early Termination Value" and the debtor will receive title to the vehicle.

The ambiguity lies in Paragraph 11(a), which defines Early Termination Value as follows:

> (i) the Capitalized Cost of such Leased Vehicle, plus (ii) any Charges due and payable under the Lease Agreement with respect to the Leased Vehicle, less (iii) that part of the Lease Charges paid by Lessee with respect to the Leased Vehicle, which has been earned by Lessor on an actuarial basis.

Master Lease, ¶11(a). The capitalized cost in Paragraph 11(a)(i) is stated in the Supplements. The amount "due and payable" in Paragraph 11(a)(ii) could mean either the amounts that have accrued but are unpaid under the lease at the point in time when the Early Termination Value is being determined, or it could be read to mean all remaining amounts due under the lease through the lease term. The parties understood it to mean the former, and the court will not quibble with that understanding. Paragraph 11(a)(iii), however, cannot be determined by the language of the Master Lease or the Supplements. The Master Lease does not explain what the phrase "that part of the Lease Charges paid by Lessee with respect to the Leased Vehicle, which has been earned by Lessor on an actuarial basis" means.

Ford's witness was not helpful in clarifying the meaning of the provision. She initially testified that each monthly lease payment includes two components: the capitalized cost spread over the term of the lease contract plus a "rent" charge, which is comprised of Ford's costs to carry the vehicle plus profit, "similar to interest." The leases nowhere define or even mention a "rent" charge, but it appears to be determinable by the information in the Supplements. For

8

example, the capitalized cost of vehicle XX-6649 is $76,388.18, which if paid equally over a 60 month term would be $1,273.14 per month. Ford Proof of Claim 28-2, Part 3. The lease charge, however, is $1,401.10. *Id.* Accordingly, the monthly "rent" would be $127.96, or the difference between the lease charge ($1,401.10) and the portion of the lease charge that is attributable to the capitalized cost ($1,273.14). The debtor did not share this understanding.

Further, the phrase "earned . . . on an actuarial basis" is not clear. Ford's testimony suggested that the phrase simply equates to amortization, rather than an actuarial determination, so that the calculation takes into account the number of months the lease was in effect until termination. Thus, it appears that the phrase "that part of the Lease Charges paid by Lessee with respect to the Leased Vehicle, which has been earned by Lessor on an actuarial basis" would be the "rent" charge amortized over the portion of the lease leading to the early termination. Therefore, to follow through with the example of vehicle XX-6649, if the lease were terminated after month two and the debtor was then current on lease payments, the capitalized cost would be $76,388.18, no amounts would be due and payable, and "that part of the Lease Charges paid by Lessee with respect to the Leased Vehicle, which has been earned by Lessor on an actuarial basis" would be $255.92, leaving $76,132.26 due to Ford.

Ultimately, however, Ford's witness testified—and Ford argued—that the Assumed Residual is a component of Early Termination Value, even though the calculation in Paragraph 11(a) does not equate to the Assumed Residual nor is the Assumed Residual a stated component of the Early Termination Value. Ford argued that, under Paragraph 10 of the Master Lease, if the debtor retains the vehicle at the expiration of the lease, it must pay the Assumed Residual (in addition to any unpaid charges due under the lease). For several reasons, the court accepts the interpretation of the Master Lease that Ford must be paid the Assumed Residual upon expiration

9

if the debtor retains the vehicle, or upon an early termination. There really was no disagreement between the parties, even if the Master Lease language was unclear, that at the expiration of the lease the debtor can retain the vehicle simply by paying the Assumed Residual. And the same calculation of Early Termination Value applies to termination as it does to expiration where the debtor retains the vehicle. Further, this interpretation is consistent with Mr. Flippo's understanding that, in all events, if the debtor can retain the vehicle by paying Ford the amounts otherwise due under the lease plus the 10% Assumed Residual. It also is consistent with the ultimate testimony of Ford's witness and Ford's argument at the hearing. Therefore, both parties are essentially in agreement. Accordingly, the court interprets the Master Lease to mean that, upon expiration, if the debtor retains the vehicle it must pay Ford the Assumed Residual, in addition to any unpaid amounts under the lease. Likewise, upon early termination, Ford must be paid all amounts remaining to be paid under the lease plus the Assumed Residual for the debtor to retain the vehicle.

II.

The court now turns to the question of whether the transactions are true leases or secured financing arrangements. "Whether an agreement is a true lease or a secured financing arrangement under the Bankruptcy Code is a question of state law." *Duke Energy Royal, LLC v. Pillowtex Corp. (In re Pillowtex, Inc.)*, 349 F.3d 711, 716 (3d Cir. 2003); *accord Butner v. United States*, 440 U.S. 48, 54–55 (1979). The Master Lease Agreement's choice of law provision provides that the governing law will be the "laws of the state where [the debtor's] chief executive office is located." Master Lease, [¶1]. The debtor's chief executive office is located in Maryland.

The relevant statute is Md. Code Ann., Com. Law §1-203 (West 2016).[1]  Because §1-203 is a codification of the Uniform Commercial Code ("UCC"), the court may consider the decisions of other state and federal courts interpreting UCC §1-203.  *WorldCom, Inc. v. GE Glob. Asset Mgmt. Servs. (In re WorldCom, Inc.)*, 339 B.R. 56, 63–64 (Bankr. S.D.N.Y. 2006) (citing *PSINet, Inc. v. Cisco Systems Capital Corp.*, 271 B.R. 1, 41, 43 (Bankr. S.D.N.Y. 2001); *In re Edison Bros.,* 207 B.R. 801, 809 n. 7 (Bankr. D. Del. 1997)).

"Whether a transaction in the form of a lease creates a lease or security interest is determined by the facts of each case."  UCC §1-203(a).  To assist in this determination, the statute sets forth a "Bright-Line Test," which requires the finding of a security interest per se if its two prongs are satisfied.  *In re ECCO Drilling Co., Ltd.*, 390 B.R. 221, 227 (Bankr. E.D. Tex. 2008); *Addison v. Burnett*, 41 Cal. App. 4th 1288, 1295 (1996).  "The Bright Line Test looks to the substance of the transaction and not the parties' intent."  *Fangio v. Vehifax Corp. (In re Ajax Integrated, LLC)*, 554 B.R. 568, 578 (Bankr. N.D.N.Y. 2016) (citing *PSINet*, 271 B.R. at 44).  The party attempting to reclassify a lease as a security interest bears the burden of proof.  *In re QDS Components, Inc.*, 292 B.R. 313, 321-22 (Bankr. S.D. Ohio 2002) (citing *In re Murray,* 191 B.R. 309, 316 (Bankr. E.D. Pa. 1996)); *In re Pillowtex*, 349 F.3d at 716 (citing *In re Owen*, 221 B.R. 56, 60 (Bankr. N.D.N.Y. 1998)).

Here, the debtor does not contend that the agreements create a per se security interest under §1-203(b).  But this does not end the inquiry.  *Sunshine Heifers, LLC v. Citizens First Bank, (In re Purdy)*, 763 F.3d 513, 519 (6th Cir. 2014), reh'g denied (Sept. 3, 2014) (citing *In re Pillowtex*, 349 F.3d at 717) (internal quotation marks omitted); *In re QDS*, 292 B.R. at 340-41; *see also* 4 White, Summers, & Hillman, Uniform Commercial Code § 30:14 ("Once a court

---

[1] UCC §1-203 was previously codified as UCC §1-201(37).  Quotations using §1-201(37) have been edited for clarity.

11

concludes that a lease is not terminable and that none of the conditions of 1-203(b)(1) to (4) has been met, its work is not done.  Failure to meet one of these conditions signifies only that the document is not conclusively a security agreement.").  Rather, the court must engage in a contextual analysis to determine whether the facts and circumstances surrounding the agreement evidence the creation of a security arrangement or a true lease.  *In re WorldCom, Inc.*, 339 B.R. at 70.

> *Meaningful Reversionary Interest*

"The central feature of a true lease is the reservation of an economically meaningful interest to the lessor at the end of the lease term."  *In re Grubbs Constr. Co.*, 319 B.R. 698, 715 (Bankr. M.D. Fla. 2005); *see also In re Ajax*, 554 B.R. at 578; *In re QDS*, 292 B.R. at 333.  "If there is a meaningful reversionary interest—either an up-side right or a down-side risk—the parties have signed a lease, not a security agreement.  If there is no reversionary interest, the parties have signed a security agreement, not a lease."  4 White, Summers, & Hillman, Uniform Commercial Code § 30:14 (6th ed. 2017).  "In other words, is the transaction structured in such a way that the lessor has an objectively reasonable economic expectation that the goods will come back to it at the end of the lease term?"  *In re ECCO Drilling*, 390 B.R. at 227.  If not, "the lessor has no interest in the economic value or remaining useful life of the goods, and therefore the lessor transferred title to the goods, in substance if not in form."  *In re WorldCom, Inc.*, 339 B.R. at 72.

"[W]hile [§1-203] sends a court on a search for the lessor's residual interest, it provides no path markers to guide the way."  *In re QDS*, 292 B.R. at 341.  Rather, §1-203 lists six conditions that, alone, are not sufficient to distinguish between a lease and security agreement.  *Id.*  Specifically, 1-203(c) provides:

> (c) A transaction in the form of a lease does not create a security interest merely because:
>
> > (1) the present value of the consideration the lessee is obligated to pay the lessor for the right to possession and use of the goods is substantially equal to or is greater than the fair market value of the goods at the time the lease is entered into;
> >
> > (2) the lessee assumes risk of loss of the goods;
> >
> > (3) the lessee agrees to pay, with respect to the goods, taxes, insurance, filing, recording, or registration fees, or service or maintenance costs;
> >
> > (4) the lessee has an option to renew the lease or to become the owner of the goods;
> >
> > (5) the lessee has an option to renew the lease for a fixed rent that is equal to or greater than the reasonably predictable fair market rent for the use of the goods for the term of the renewal at the time the option is to be performed; or
> >
> > (6) the lessee has an option to become the owner of the goods for a fixed price that is equal to or greater than the reasonably predictable fair market value of the goods at the time the option is to be performed.

Md. Code Ann., Com. Law §1-203(c). The statute offers no further guidance. "By failing to include an explicit test for assessing whether a lessor has retained a meaningful reversionary interest, the drafters of [§1-203] have created the same confusion and unpredictability in the caselaw that existed under [the previous statute]." *In re QDS*, 292 B.R. at 341.

Courts have adopted several approaches to aid the determination of whether the lessor has retained a meaningful reversionary interest. *Id.* at 342. "Indeed, there seem to be nearly as many different approaches to determining the existence of a meaningful residual interest as there are reported decisions." *Id.*

One such test is the Economics-of-the-Transaction test, where the court looks to "(1) whether the lease contains a purchase option price that is nominal; and (2) whether the lessee develops equity in the property, such that the only economically reasonable option for the lessee

13

is to purchase the goods." *In re Purdy*, 763 F.3d at 520 (internal quotations omitted); *GEO Fin., LLC v. Univ. Square 2751, LLC*, 105 F. Supp. 3d 753, 763 (E.D. Mich. 2015); *In re QDS*, 292 B.R. at 342.

Another set of cases apply the Economics-of-the-Transaction test, but the court considers other factors. *In re WorldCom, Inc.*, 339 B.R. at 72 ("Though these two factors have been considered the most relevant and useful, there is no suggestion . . . that no other factors may be considered."); *Park W. Fin. Corp. v. Phx. Equip. Co. (In re Phx. Equip. Co.)*, No. 2:08-bk-13108-SSC, 2009 WL 3188684 (Bankr. D. Ariz. Sep. 30, 2009). The other factors considered include the practical inability of the lessee to return the leased goods, *In re WorldCom*, 339 B.R. at 74; which party bore responsibility for the return of the leased goods, *id.*; and whether the purchase option was exercised in previous agreements between the same parties, *In re Phx. Equip. Co.*, 2009 WL 3188684 at *11.

Other courts apply the "all the facts and circumstances" test. Under this test, the court looks to the economic factors of the agreement to determine whether the lessor retained a meaningful reversionary interest. *In re Gateway Ethanol, L.L.C.*, 415 B.R. 486, 504 (Bankr. D. Kan. 2009); *In re UNI Imaging Holdings, LLC*, 423 B.R. 406, 419 (Bankr. N.D.N.Y. 2010). The court considers six factors:

> (1) the anticipated useful life of the equipment;
> (2) the ability of the lessor to market the equipment at the end of the lease term;
> (3) the amount of the lease payments over the term of the contract in relation to the initial value of the equipment;
> (4) whether the equipment is unique because it was designed for installation in the debtor's facility;
> (5) whether at the time of the agreement the long term operation of the debtor's facility required its continued possession of the equipment; and
> (6) the economic benefit to the debtor in having the transaction structured as a lease rather than a sale.

*In re UNI Imaging*, 423 B.R. at 419.

Some courts have also considered the following, non-exclusive, factors:

1) whether the lease is terminable at will by the lessee;
2) whether the lessor has the duty to repair;
3) whether the lessee is compelled to purchase the goods at the termination of the lease;
4) whether mandatory payments due under the lease are equal to or greater than the value of the leased goods; and
5) whether the useful life of the leased property exceeds the term of the lease.

*Assembly Techs., Inc. v. Phx. Elec. Mfg. Servs., LLC (In re Phx. Elec. Mfg. Servs., LLC)*, 429 B.R. 195 (Bankr. D.S.C. 2010); *In re Parker*, 363 B.R. 769, 775 (Bankr. D.S.C. 2006).

At least one court has found a meaningful reversionary interest where at the end of the agreement, the interest in the leased property reverts to the lessor and the lessor is free to lease the property to another party. *Frontier Energy, LLC v. Aurora Energy, Ltd. (In re Aurora Oil & Gas Corp.)*, 439 B.R. 674 (Bankr. W.D. Mich. 2010). Another court has defined the test as:

Under the terms of the lease, does the lessor retain either an up-side gain or a down-side risk at the end of the lease period[?] In the context of this case it may be stated: If the lease terms provide that at the end of the lease the lessor will receive either return of the leased goods or the reasonably predicted fair market value the goods will have at the time the option is to be performed, the lessor has retained a meaningful reversionary interest.

*Sankey v. ABCO Leasing, Inc. (In re Sankey)*, 307 B.R. 674, 682 (D. Alaska 2004).

Another test is called the "Economic Realities" or "Sensible Person" test. It provides:

where the terms of the lease and option to purchase are such the only sensible course for the lessee at the end of the lease term is to exercise the option and become the owner of the goods, the lease was intended to create a security interest. Articulated in a less genteel manner, if only a fool would fail to exercise the purchase option, the option is generally considered nominal and the transaction characterized as a disguised security agreement. No matter how the option amount is expressed, if the only sensible course of action is to exercise the option, then it is one intended for security.

*In re Triplex Marine Maint., Inc.*, 258 B.R. 659, 672 (Bankr. E.D. Tex. 2000) (citations and quotations omitted); *In re ECCO Drilling*, 390 B.R. at 229; *Kentuckiana Med. Ctr. LLC v.*

15

*Leasing Grp. Pool II, LLC (In re Kentuckiana Med. Ctr. LLC)*, 455 B.R. 694, 701-02 (Bankr. S.D. Ind. 2011).

Other courts have found that a lessor retains no meaningful reversionary interest where the lessor will only receive the residual value of the leased property at the end of the lease term. *Brankle Brokerage & Leasing, Inc. v. Volvo Fin. Servs. (Brankle Brokerage & Leasing, Inc.)*, 394 B.R. 906, 914 (Bankr. N.D. Ind. 2008); *see also In re Grubbs Constr. Co.*, 319 B.R. at 718-19 ("Upon the recognition of [a pecuniary] interest [in the lessee], the parties are deemed as a matter of law to have intended the lease as security. For instance, if the lessee is entitled to any surplus of proceeds after the lessor claims liquidated damages under the agreement, then the agreement recognizes an 'equity' in the lessee.") (citations omitted). The courts that have reached this conclusion share the rationale that no meaningful reversionary interest can be retained where the lessor has neither up-side right nor a down-side risk. *Brankle*, 394 B.R. at 914. Regardless of how the property is disposed of at the end of the lease, the lessor receives the same amount. *Id.* By contrast, the lessee bears the risk of any deficiency and reaps the profits of any equity. *Id.* Accordingly, these courts conclude that the lessee in such situations maintain an ownership interest in the property. *Id.*

Only two Maryland cases address the issue. Most recently, the Court of Appeals of Maryland addressed whether a consumer vehicle lease was a true lease in *Keeling v. Ford Motor Credit Co.*, 550 A.2d 932 (Md. 1988). The 48-month consumer lease at issue included boilerplate language requiring the lessee to obtain appropriate insurance, pay all operating and maintenance costs, pay all fees and taxes on the vehicle, and to indemnify the lessor "from all claims, losses and costs arising out of the use or condition of the Vehicle." *Keeling*, 550 A.2d at 935. The lease also required the lessee to pay an excess mileage fee of $0.06 for each mile over

16

60,000 miles at the end of the lease. *Id.* Finally, the lease did not have a purchase option but did set the residual value of the vehicle at 51.48% of the vehicle's value at the time of the agreement. *Id.* at 941.

Reviewing the lease under the previous version of §1-203, the court found that the agreement was a true lease. *Id.* at 941. The court's fact-based analysis focused on the residual interest the lessor preserved for itself at the end of the lease. *Id.* The court found important that the creditor included in the agreement a stringent repair clause and a penalty for mileage exceeding 60,000 miles. *Id.* Additionally, the court noted that the lessor had set the residual value at 51.48%, meaning the vehicle would maintain substantial resale value at the end of the lease term. *Id.* Taken together, the court felt that the economic structure of the agreement suggested that the lessor tried to preserve the value of the vehicle for when the vehicle was returned at the end of the lease.

The only other Maryland case is an earlier Court of Appeals decision in *Crest Inv. Tr., Inc. v. Atl. Mobile Corp.*, 250 A.2d 246 (Md. 1969). In *Crest*, the court reviewed a 12-month lease for an office trailer. *Crest*, 250 A.2d at 248. The lease included an option to purchase the trailer at the end of the lease for approximately 58% the value of the trailer. *Id.* at 249. Again, under the previous version of §1-203, the court outlined a number of factors to be considered when determining whether a lease is a true lease:

> 1. The facts in each case control to show intention of the parties to create a security interest.
> 2. Reservation of title in a lease or option to purchase appurtenant to or included in the lease does not in and of itself make the lease a security agreement.
> 3. Lease agreement which permits the lessee to become the owner at the end of the term of the lease for a nominal or for no additional consideration is deemed intended as a security agreement as a matter of law.
> 4. The percentage that option purchase price bears to the list price, especially if it is less than 25%, is to be considered as showing the intent of the parties to make a lease as security.

17

> 5. Where the terms of the lease and option to purchase are such that the only sensible course for the lessee at the end of the lease term is to exercise the option and become the owner of the goods, the lease was intended to create a security interest.
> 6. The character of a transaction as a true lease is indicated by:
> (a) Provision specifying purchase option price which is approximately the market value at the time of the exercise of the option.
> (b) Rental charges indicating an intention to compensate lessor for loss of value over the term of the lease due to aging, wear and obsolescence.
> (c) Rentals which are not excessive and option purchase price which is not too low.
> (d) Facts showing that the lessee is acquiring no equity in leased article during the term of lease.

*Id.* at 248 (quoting *In re Alpha Creamery Co., Inc.*, No. 29,264-B, 1967 WL 8996 (Bankr. W.D. Mich. June 8, 1967)). After reviewing the lease and the testimony of the parties concerning the purchase option, the court, without analysis, held that there was "little, if any, doubt that the intention of the parties was to execute a lease and not a security instrument." *Id.* at 249.

The court expresses some doubt that these cases are still good law following the 1987 amendments to §1-203. *Keeling* relies on the considerations and factors outlined in *Crest*, which seek to find the parties' intention when entering into the agreement. *Keeling*, 550 A.2d at 940-41; *Crest*, 250 A.2d at 248. The official comments to §1-203 expressly disavow references to the parties' intent. Official Comment to §1-203 ("Reference to the intent of the parties to create a lease or security interest led to unfortunate results. In discovering intent, courts relied upon factors that were thought to be more consistent with sales or loans than leases. Most of these criteria, however, were as applicable to true leases as to security interests.").

These doubts aside, the court does not find either Maryland case particularly helpful in reviewing the leases before it. *Keeling* deals with a pure consumer lease, which is clearly distinguishable from the agreement before the court. While *Crest* listed a number of factors, it did not provide much guidance on their significance.

Here, the court's review of the Master Lease and the Supplements under any of the tests described above leads to the conclusion that Ford did not reserve a meaningful reversionary interest. By not preserving a reversionary interest, Ford entered in a security arrangement with the debtor, not a lease. *In re WorldCom, Inc.*, 339 B.R. at 72; 4 White, Summers, & Hillman, Uniform Commercial Code § 30:14.

In particular, the court finds the line of cases holding that a security agreement is created where a lessor will only receive the residual value of the leased property at the end of the lease term to be most compelling. As discussed above, at the termination of the lease, Ford will receive only the Assumed Residual, regardless of whether the vehicle is sold by the debtor, sold by Ford, or simply retained by the debtor. If the vehicle is sold, any surplus above the Assumed Residual must be passed to the debtor. If sold for less that the Assumed Residual, the debtor must pay Ford the deficiency. If the debtor retains the vehicle at the expiration of the lease, it must pay Ford the Early Termination Value, which the court has interpreted to mean the Assumed Residual, consistent with the parties understanding. It is therefore apparent that Ford has neither up-side right nor a down-side risk, and thus, has no reversionary interest. *Brankle*, 394 B.R. at 914.

The court also finds support in the Economic Realities test. At the hearing, Mr. Flippo testified that the vehicles have an expected useful life of 10 to 15 years. This testimony was uncontroverted. While the lease does not provide a purchase option in so many words, the debtor has the right to retain the vehicle upon paying the Assumed Residual—the functional equivalent of a purchase option. Because the vehicles can be used for an additional 5 to 10 years by paying the Assumed Residual (which is the equivalent of just 5.5 more monthly payments under each lease), "the only sensible course for the [debtor] at the end of the lease term is to

exercise the option and become the owner of the goods." *In re Triplex Marine Maint., Inc.*, 258 B.R. at 672. Stated otherwise, "only a fool would fail to exercise the purchase option." *Id.*

Considering all the facts and circumstances of the agreement, the Master Lease and Supplements make clear that the transaction was not "structured in such a way that the lessor has an objectively reasonable economic expectation that the goods will come back to it at the end of the lease term." *In re ECCO Drilling*, 390 B.R. at 227. Thus, "the lessor has no interest in the economic value or remaining useful life of the goods, and therefore the lessor transferred title to the goods, in substance if not in form." *In re WorldCom, Inc.*, 339 B.R. at 72.

## Conclusion

For the foregoing reasons, the court determines the transactions are secured financing arrangements, not true leases. The court will deny the motions for relief from the automatic stay to the extent they are premised on the debtor's failure to comply with 11 U.S.C. §365(d)(5), and will set a hearing on the remaining issues to be resolved in connection with Ford's motions for relief from stay. A separate order will follow.

cc:   All Parties
      All Counsel

**End of Memorandum of Decision**